Statement of the Case.
MONROE, C. J.
Plaintiff (Mrs. W. G. Marable, aided by her husband) brought this suit against W. T. Barhan and Mrs. M. E. West, the executrix and legal representative of J. B. West, and the petition originally filed by her (on December 3, 1909) alleges, in substance, that she owns, in her paraphernal right, two tracts of land in Morehouse parish containing 120 and 57.78 acres, respectively, in the management of which her husband has acted as her agent; that prior to the commission of the acts here complained of they were improved with buildings and fences, were well drained, highly cultivated, produced fine crops, and were worth $15,000; that during or about the year 1906 defendant Barhan, on his own account and with the authorization of J. B, West (who was part owner with him of one, and sole owner of another, adjoining place), and since the death of "VVest, with the authorization of his legal representative, began the construction of, and from year to year since then has opened, widened, and deepened, “a system of canals” which have directed the natural flow of the drainage from the places owned by them and thrown it upon the tracts owned by her, with the results that her lands have become subject to annual inundations, her ditches have been closed, her houses ruined, her fences destroyed, and her lands rendered uncultivable and valueless. She alleges that she protested against the work as soon as she learned of it; that it has been done willfully and maliciously; and that she has thereby sustained loss as follows: $3,000 per annum since 1906, being the net profit upon crops that she would have made; $100 by reason of damage to a storehouse; $750, $500, $75, and $350 by destruction of five tenant houses, an apple orchard, a fig tree, and fences, respectively; and $5,000 by reason of deterioration, amounting to 50 per cent., in the producing capacity and value of the land. She alleges that J. B. West died several years prior to the institution of the suit, leaving property in Morehouse parish, and that his widow, Mrs. M. E. West, is his testamentary executrix, administering his sue- *257 cession, and resides in New Orleans. She prays that the defendants so named be cited, and that she have judgment against them in solido for $18,775, with $3,000 per annum additional—
“after the present year, or, in lieu of the $3,000 loss of profit per annum, for the sum of $1,200 per annum as the rental value of the property from the year 1906, inclusive.”
She further prays that defendants be enjoined from further work on the canals, and that they be required to fill them up forthwith. On June 8, 1910, an exception of “no cause of action,” filed on behalf of the executrix, was sustained, after which the litigation was carried on between plaintiff and •Barhan, and, as against Barhan, who in the meanwhile had filed several exceptions, plaintiff in January, 1911, filed an amended petition, alleging, in substance that on December 13, 1910, she had sold the land concerning which she had brought the suit, and that, in consequence thereof, she was no longer interested in obtaining the injunction, and that:
“Her right of action for damages [specified] to ditches, fences, • orchards, trees, storehouse, and tenant houses, and for deterioration of soil and land, has become merged in her claims for reparation for the depreciation or loss of value of her said plantations from the overflows complained of in her original petition, as will be now definitely set out.”
And she thereupon alleges that she had sold her plantation for $7,000, which was less by $6,000 than its value before it had been deteriorated or devastated by the overflow caused by the drainage system of the defendants.
“She further alleges that the sole further cause of action for the loss of revenue from her nonuse of her property for five years (from the first of the year 1906 until the year 1910) is definitely set out in her first petition, and is unaffected by her said sale.”
She abandons the allegation made in her original petition that defendants had resorted to their system of drainage in order to compel her to sell her place, but insists, nevertheless, that such was the effect, and she prays for judgment against Barhan alone for $6,000, as the difference between the amount received by her in the sale and the amount that, as she alleges, she should have received, and for a—
“further judgment * * * for petitioner’s loss of crops and deprivation of the use of revenue from her said place, as prayed for in the original petition (any and all other demands in her original petition, except those first mentioned, and all demands in excess of those herein mentioned being abated, relinquished, and remitted),” etc’.
Subsequently she elected to proceed on her claim for loss of revenue, rather than for loss of rent, or rental value, between 1906 and 1910.
The amended petition, filed January 3, 1911, contains no prayer for citation upon, or judgment against, Mrs. West, executrix; the case having never been put at issue as to her either by answer or default, for the reason, apparently, that she was regarded as having been eliminated by the judgment of June 8, 1910 (from which no appeal was taken), sustaining her exception of no cause of action. On April 19, 1912, however, the trial court rendered the judgment which is the subject of the present appeal, and which reads as follows, to wit:
“This cause was_ regularly reached on the docket, called for trial after issue joined by answer, and, by reason of the law and the evidence being in favor of defendants and against plaintiff, it is therefore, ordered, adjudged, and decreed that plaintiff’s demands be rejected in toto, at her costs.”
Opinion.
[1] Plaintiff thereupon filed a petition praying for a devolutive appeal, and “for service and citation upon defendants herein,” and a citation was issued directed to “Mrs. M. E. West, Executrix of Estate of J. B. West, Deceased, New Orleans, Da.,” upon which there appears the following return, I to wit:
*259 “Received in office on April 20, 1913, and on the same day of the same month and year I served a copy of this citation of appeal on Mrs. W. T. Barhan, Mrs. West being out of the parish. I was advised by Mr. L. P. Leavel, for plaintiff, to make this service on Mrs. Barhan.
“[Signed] J. P. Carpenter, Sheriff.”
There is nothing in the record or elsewhere to indicate that Mrs. Barhan was authorized to represent Mrs. West, and her (Mrs. West’s) counsel, who also represents the other defendant, has moved to dismiss the appeal as to both, on the ground, that, through the fault of the appellant, “there has been no legal service of petition and citation of appeal.”
The motion is weE founded as to Mrs. West, executrix, and is sustained, though we are inclined to think that plaintiff's claim, as to her, had already been abandoned.
The citation of appeal addressed to W. T. Barhan is conceded, in the brief of his counsel, to have been served upon his wife at his domicile in Morehouse parish, and the return shows that he was absent therefrom. The motion to dismiss as to him is therefore overruled.
[2] Upon the merits of the case, the testimony, of which there is a great deal, is conclusive to the effect that plaintiff has sustained no loss by reason of the acts charged against defendant. Referring to the subjoined “Sketch A,” which has been made (with sufficient accuracy for the purposes of illustration) from the numerous plats of survey that w,e find in the record, it will be seen that the plaintiff owned the “Marable Parm,” and the “parable Tract”; that defendant Barhan and J. B. West, deceased, owned the “Duvall Tract”; and that West owned the “Hampton Place” and the “Larkin Place.” What plaintiff in her petition calls a “system of canals” is designated on “Sketch A” by the words “Drainage Canal,” but the thing so called and so designated is, in fact, a ditch (said to have been made with a plow) 2% feet deep by about 10 inches in width at the bottom, and which, by caving, washing, and erosion, has sprawled itself out at the top to a width, in places, of 10 feet or more. It extends, as may be seen, from the east side of the “Duvall Tract” to a point near the west side of the “Hampton Place,” where it discharges, either into a natural drain, which in dry weather is called a “swale,” and in wet weather becomes, as we imagine, a “slough,” or into a ditch leading into such swale or slough, and which, passing through the southeast corner of the “Marable Tract,” into the “Statham Parm”, and thence westward, discharges into the “Main Slough,” which is said to empty its waters into Bayou Bonnidee. The water from the southern extremity of the “Duvall Tract” is carried, naturally, in the same general direction, by means of a slough which passes through “Marable Parm,” and renders the same service for that estate; in fact, it could not do otherwise unless it should be allowed to soak into the ground or evaporate, or should be induced to flow uphill; since the lands designated upon the east side of the sketch are higher than those upon the west side, and the waters falling upon them flow naturally to the westward and northwestward. It is shown that there is a fall of 8.9 feet, between the point X (on the eastern boundary off the “Duvall Tract”) and the point Y near the western boundary of the “Hampton Place,” which is intended to designate the “Statham Swale,” into which defendant’s ditch discharges, either directly or through another ditch.
And Mr. Leigh, a civU engineer, called as a witness for plaintiff, gives the following testimony as to the declension further westward:
“Q. Prom your observation, what would you say as to the relative levels of the land at point X [referring to a point marked X upon another sketch, but which upon the Sketch A hereto attached is indicated approximately by the letter Y] on the west edge of the Hampton field, and the land at a point considerably west of that? A. There is considerable fall, more properly described as a heavy fall, to the west. I think, *261 probably, that that fall would amount to as much as 20 feet in 2% miles.”
Mr. Jouvenat, also a civil engineer, called by plaintiff:, testified that he took levels in the bottom of the canal here in question from one end to the other, and as follows:
“It showed the elevation of the bottom of the canal at its mouth to be 95 feet, and' the elevation at its source to be 103.4 feet, making a total fall of S.4 feet from one end to the other.”
It appears, too, that the water from the northern part of the “Duvall Place,” and much of that from the northern part of the “Hampton Place,” is carried off by the swales which run through the “Rolfe” lands, west by north; and, though it is said that the canal collects part of the water that falls or drains upon the northern part of the “Hampton Place,” we fail to find that the same water would not go naturally into the “Statham Swale,” if the canal were not there. As an answer to a theory propounded on behalf of plaintiff that the water carried by the slough northwesterly through the “Marable Farm” is headed and forced back by that carried to the same outlet by the canal, it is shown that, if the water in the slough should be forced back in that way, it would inundate more of the “Hampton Place” than of the “Marable Farm,” which seems quite evident from the relative positions of the two tracts.
Plaintiff shows that little or nothing was done in the way of cultivating her land between 1906 and 1911, and it seems likely that her husband, who was managing for her, was discouraged by the prevalence of water; for the entire surface of the land in that district seems to be made up of sloughs, swales, and ponds, with ridges between; but the surrounding places were all cultivated during that period, and Mr. Wimberly, who bought plaintiff’s property in December, 1910, for $7,000, and who has 1,000 acres under cultivation, found tenants and made a crop on it in 1911, though there was no change made in the drainage, and he concurs with many-other witnesses in the view that the canal, or ditch, here complained of affords no just cause of complaint. The probability is, as we think, that the water flowing through the canal, and through the swale or slough, and the “Marable Ditch,” which drain the “Mar-able Farm,” and all of which finds its way into the “Statham Swale,” is obstructed by the ditch leading into that swale or slough, and, whilst each system of drainage contributes the water which, thus obstructed, overflows the adjacent lands, defendant’s “Hampton Tract” receives it earlier and in greater abundance.
Part of Mr. Leigh’s testimony on that subject reads as follows:
“Q. Now then, if that is a fact, why didn’t the water that ran through plaintiff’s east and west ditch and up_ the Statham lane, and emptied into that basin about which you have testified, also did in overflowing, if it was overflowed, that 60-acre tract' of land [referring to the Marable tract]. A. It did.”
Plaintiff testifies that in 1904 or 1905 (as nearly as she could remember) she received an offer of $9,000 for her property, and it does not appear that any better offer was ever made. But she admits that the value of such lands must have been materially affected by the subsequent appearance of the Doll weevil, and the other evidence adduced goes to show that the price for which she sold in 1910 was a very fair one.
There was also some testimony adduced on behalf of plaintiff to the effect that her planting operations, under her husband’s management, were successful prior to 1906, but, according to her admission, she imposed successive mortgages upon her property in 1896, 1901, 1902, and 1905, and over $2,500 of the price which she received was devoted to the payment of a mortgage debt which was unpaid at the date of the sale. Upon the whole, our conclusions are that defendants were within their rights in ditching their, land as they did in order to facilitate its ‘natural *263 drainage; that they have thereby imposed no heavier burden upon plaintiff than she was otherwise bound to bear; and that she has no just cause of complaint.
The judgment appealed from is therefore affirmed.